**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| TAYLOR PRUITT ROBERSON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )　　1:20CV306 |
| | ) |
| BENITA WITHERSPOON, | ) |
| | ) |
| Respondent. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition"). (Docket Entry 1.) Respondent moved for summary judgment (Docket Entry 4; see also Docket Entry 5 (Supporting Brief)), Petitioner responded in opposition (Docket Entry 6), and Respondent replied (Docket Entry 7). For the reasons that follow, the Court should grant Respondent's Motion for Summary Judgment.

## I. Background

On May 18, 2016, a jury in the Superior Court of Davidson County found Petitioner guilty of two counts of statutory rape, two counts of first-degree sex offense, and two counts of indecent liberties with a child in cases 14 CRS 56441 and 56549. (See Docket Entry 1 at 4; see also Docket Entry 1-1 at 51, 76.)[1] The trial court consolidated the convictions in each case and imposed two consecutive sentences of 200 to 300 months' imprisonment. (See Docket Entry 1 at 4; see also Docket Entry 1-1 at 52-57, 61-62, 64-

---

[1] Throughout this Recommendation, pin citations refer to the page number in the footer appended to documents at the time of their docketing in the CM/ECF system.

65, 67-70, 74-75). Additionally, the trial court ordered that, upon release, Petitioner submit to lifetime satellite-based monitoring (see id. at 58, 71), and entered Permanent No-Contact Orders to protect the victim (id. at 59-60, 72-73).

Following her convictions, Petitioner (represented by retained appellate counsel) appealed to the North Carolina Court of Appeals. (See Docket Entry 1 at 5; see also Docket Entry 1-1 at 77-82; Docket Entry 1-3 (Petitioner's Brief); Docket Entry 1-4 (State's Brief); Docket Entry 1-5 (Petitioner's Reply-Brief).) The Court of Appeals found no error, State v. Roberson, No. COA16-939, 800 S.E.2d 136 (table), 2017 WL 2437004 (N.C. App. Jun. 6, 2017) (unpublished), and the North Carolina Supreme Court denied Petitioner's counseled petition for discretionary review ("PDR"), State v. Roberson, 370 N.C. 72, 803 S.E.2d 389 (2017).

Thereafter, Petitioner (assisted by the same appellate counsel) submitted a motion for appropriate relief ("MAR") to the trial court (Docket Entry 1 at 5; see also Docket Entry 1-10), which the trial court summarily denied (Docket Entry 1 at 5; see also Docket Entry 1-12). The North Carolina Court of Appeals later denied Petitioner's counseled certiorari petition seeking review of her MAR's denial. (Docket Entry 1 at 5; see also Docket Entry 1-13 (Petitioner's certiorari petition); Docket Entry 1-14 (State's Response); Docket Entry 1-15 (Court of Appeals' Order ).)

Petitioner (proceeding through the same appellate counsel) subsequently instituted this action via her Petition. (Docket Entry 1.) Respondent then filed the instant Motion (Docket Entry

-2-

4) and Supporting Brief (Docket Entry 5), Petitioner responded in opposition (Docket Entry 6), and Respondent replied (Docket Entry 7).

## II. Facts

On direct appeal, the North Carolina Court of Appeals summarized the trial evidence as follows:

> On or about 8 August 2014, [Petitioner], then twenty-one years old, began working in the home of the victim, Brandon.[FN] [Petitioner] provided home health care services for Brandon's disabled brother. Brandon was thirteen years old. At some point between September and November of 2014, [Petitioner] and Brandon developed a relationship that became physical. At first, they hugged and kissed, then later they engaged in anal sex on three or four occasions. Brandon testified that he thought [Petitioner] "wanted it" because she did not say "no" or tell him to "stop." Brandon and [Petitioner] also engaged in oral sex on three occasions and vaginal intercourse on two occasions. Brandon testified that he did not force [Petitioner] to give him oral sex, but that she just "did it" when he asked her.
>
> On 12 November 2014, Brandon and [Petitioner] were engaging in vaginal intercourse in the family's basement when Brandon's mother called for them. Brandon and [Petitioner] quickly got dressed and started doing laundry. Brandon's mother came downstairs and asked them what was going on. Brandon told his mother that nothing was going on between him and [Petitioner]. However, that night after further questioning from his parents, Brandon gave them a note admitting that he had engaged in sexual activity with [Petitioner]. His parents contacted the police and told them about the note. After interviewing Brandon and his parents, Detective Clayton of the Lexington Police Department planned to confront [Petitioner] when she returned for work the next day.
>
> The next day, [Petitioner] unexpectedly arrived early, before Detective Clayton had arrived. Brandon's mother called the police, who dispatched two officers to "keep the peace" until Detective Clayton could arrive. The two officers did not have any contact with [Petitioner] and left the scene when Detective Clayton arrived. Detective Clayton drove an unmarked car and did not use any blue lights or sirens. The detective approached [Petitioner] and asked her if she would accompany him to his car so

-3-

they could have a private conversation about an investigation. [Petitioner] agreed and walked with the detective to his car. [Petitioner] opened the door to the front passenger seat and sat there while Detective Clayton sat in the driver's seat. Detective Clayton told [Petitioner] that she was not under arrest and was free to leave at any time. The car doors were closed, but unlocked.

During their conversation in the car, [Petitioner] admitted that she engaged in oral sex with Brandon on one occasion. Detective Clayton then arrested [Petitioner] and drove her to the police station. Upon arriving at the police station, Detective Clayton took [Petitioner] to an interview room, informed her she was no longer free to leave, and read her the Miranda warnings. [Petitioner] indicated that she understood and signed a waiver of her Miranda rights. During his interview of [Petitioner], Detective Clayton wrote a summary of what [Petitioner] told him, which she then reviewed and signed. The interview was recorded on video, as was [Petitioner]'s subsequent conversation with her husband at the police station.

[FN] [The Court of Appeals] use[d] a pseudonym to protect the identity of the minor victim.

Roberson, 2017 WL 2437004, at *1-2.

## III.  Grounds for Relief

Petitioner presents four grounds for habeas relief. (See Docket Entry 1 at 25-40.)  Specifically, she alleges that:

1) "the state court decision denying post-conviction relief based upon Petitioner's claim pursuant to the [United States] Supreme Court's 2018 decision of [McCoy v. Louisiana] was contrary to clearly-established [United States] Supreme Court precedent; in the alternative, it was based upon an unreasonable application of clearly-established federal law" (id. at 25 (standard capitalization applied, bold font and single-spacing omitted));

2) "the state court decision denying post-conviction relief based upon Petitioner's ineffective assistance of counsel claim was

-4-

contrary to clearly-established [United States] Supreme Court precedent; in the alternative, it was based upon an unreasonable application of clearly-established federal law" (id. at 31 (standard capitalization applied, bold font and single-spacing omitted));

3) "the state court decision denying post-conviction relief based upon Petitioner's claim pursuant to the [United States] Supreme Court's 2018 decision of [McCoy v. Louisiana] and her ineffective assistant [sic] of counsel claim was based upon an unreasonable determination of the facts" (id. at 37 (standard capitalization applied, bold font and single-spacing omitted)); and

4) "the state court's refusal to consider Petitioner's constitutional claim that she was denied her right to be present at a critical stage of her trial was contrary to clearly-established federal constitutional law; in the alternative, it was based upon an unreasonable application of clearly-established federal law" (id. at 38 (standard capitalization applied, bold font and single-spacing omitted)).

## **IV. Habeas Standards**

The Court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Further, "[b]efore [the] [C]ourt may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must

-5-

give the state courts an opportunity to act on his claims before he presents those claims to [this] [C]ourt in a habeas petition. The exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999); see also 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").[2]

Additionally, this Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. To qualify as "contrary to" United States Supreme Court precedent, a state court decision either must arrive at "a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confront[] facts that are materially indistinguishable from a relevant [United States] Supreme Court precedent and arrive[] at a result opposite" to the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 406 (2000). A state court decision "involves an unreasonable application" of United States Supreme Court case

---

[2] The Court may deny a claim on the merits despite a lack of exhaustion. See 28 U.S.C. § 2254(b)(2).

law "if the state court identifies the correct governing legal rule from [the United States Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous").

## V. Discussion

### A. Ground One

Ground One contends that "the state court decision denying post-conviction relief based upon Petitioner's claim pursuant to the [United States] Supreme Court's 2018 decision of McCoy v. Louisiana[, ___ U.S. ___, 138 S. Ct. 1500 (2018)] was contrary to clearly-established [United States] Supreme Court precedent; in the alternative, it was based upon an unreasonable application of clearly-established federal law." (Docket Entry 1 at 25 (standard capitalization applied, underscoring added, bold font and single-spacing omitted).) More specifically, Petitioner argues that "trial counsel conceded that no jury instruction on duress would be appropriate, even before the trial court received any defense testimony," as well as "failed to argue during his closing statement that Petitioner was not guilty[ and] did not draw upon [Petitioner's] testimony or the testimony of [Petitioner's therapist] Pamela Millan [('Therapist Millan')] at all [but] . . . instead argued for the jury to show leniency and consider the lasting impact their verdict would have." (Id. at 29.) Petitioner thus maintains that "trial counsel acted in a way which directly deprived [] Petitioner of her Constitutional right to make a

Case 1:20-cv-00306-LCB-LPA   Document 8   Filed 02/24/21   Page 7 of 46

fundamental choice about her own defense: the choice to maintain her innocence" in violation of McCoy. (Id. at 28.) According to Petitioner, "[a] violation of [Petitioner]'s Sixth Amendment-secured autonomy to maintain h[er] innocence at trial ranks as more than mere harmless error, but rather, is a structural error by counsel . . . not subject to harmless error review." (Id. at 25-26.) Petitioner therefore asserts that, "[b]y failing to even acknowledge binding [United States] Supreme Court precedent, which was decided prior to the [MAR] being filed, and by failing to apply the structural error standard to the claim, the state courts' decisions were contrary to, and were unreasonable applications of, binding [United States] Supreme Court precedent." (Id. at 30 (emphasis in original).)[3]

As an initial matter, Respondent maintains that Ground One faces a procedural bar. (See Docket Entry 5 at 8-9; see also Docket Entry 7 at 1-2.) According to Respondent, "the defendant in the McCoy[] case . . . actually raised and litigated the substance of Ground [One] as early as 2016 on direct appeal to the Louisiana appellate court." (Docket Entry 5 at 8 (citing McCoy, ___ U.S. at ___, 138 S. Ct. at 1507).) Respondent thus argues that Sections

---

[3] Petitioner conclusorily contends that McCoy should apply retroactively:

Because McCoy was decided prior to the [MAR] being filed, it was binding and retroactively applicable. The [United States] Supreme Court has held that courts must give retroactive effect, on collateral review, to new watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. Montgomery v. Louisiana, 136 S. Ct. 718, 728 (2016) (citing Teague v. Lane, 489 U.S. 288, 312-13 (1989)).

(Docket Entry 1 at 30 n.8; accord Docket Entry 6 at 3-4.)

Case 1:20-cv-00306-LCB-LPA   Document 8   Filed 02/24/21   Page 8 of 46

15A-1419(a)(3) and (b) of the North Carolina General Statutes bar Petitioner's claim, because she "was [] in an adequate position to have raised [the substance of] Ground [One] during her 2016 trial and on her 2016-2017 direct appeal but did not do so." (Id. (citing N.C. Gen. Stat. §§ 15A-1419(a)(3) and (b)).) In response, Petitioner counters as follows:

> Petitioner prosecuted her direct appeal in 2016, and it was decided on June 6, 2017 by the North Carolina Court of Appeals. The North Carolina Supreme Court denied discretionary review on August 17, 2017. McCoy v. Louisiana[] was decided on May 14, 2018 – almost 2 years after Petitioner filed her initial brief on direct appeal, and 9 months after her direct appeals concluded. Petitioner cannot be faulted for failing to argue a retroactive rule of law that had not been announced yet by the Supreme Court. Accordingly, Respondent's procedural default argument fails.

(Docket Entry 6 at 4.)

The Court need not resolve the dispute over whether Petitioner remained in an adequate position to have raised the substance of Ground One on direct appeal, because Respondent's procedural bar argument fails for a more straightforward reason – the MAR court did not decline to consider Petitioner's parallel claim in her MAR on grounds of procedural default. (See Docket Entry 1-12.) Procedural default occurs when "a state court decline[s] to hear [a claim] because the prisoner failed to abide by a state procedural rule," and "the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." Martinez v. Ryan, 566 U.S. 1, 9 (2012). Here, the MAR court's order denying relief on Petitioner's MAR provided, in pertinent part, as follows:

-9-

> [T]he [c]ourt finds as a fact the following:
>
>> 1. There are no substantial issues of fact requiring an evidentiary hearing in this matter.
>> 2. [Petitioner]'s two points of contention <u>fail based upon the record</u> in these matters.
>
> Based upon the foregoing findings of fact, the [c]ourt concludes as a matter of law that no substantial issues of fact exist which would otherwise require an evidentiary hearing in the matter at bar, [Petitioner]'s points of contention fail <u>based upon the record</u> in these matters, and [Petitioner]'s [MAR] should be denied.

(Docket Entry 1-12 (emphasis added).) Because the MAR court denied Petitioner's parallel claim on the merits, rather than declining to consider it on the basis of an adequate and independent state procedural rule, Ground One does not face a procedural bar. <u>See Thomas v. Payne</u>, 960 F.3d 465, 472 (8th Cir. 2020) (reversing district court's finding of procedural default where "the [post-conviction] court did not decline to hear [the petitioner]'s [] ineffective-assistance claim[ but r]ather, . . . clearly ruled on the merits of the claim").

Turning to the merits of Ground One, the MAR court neither unreasonably applied nor contradicted <u>McCoy</u> in denying Petitioner's parallel claim, because the United States Court of Appeals for the Fourth Circuit recently held that "the rule announced in <u>McCoy</u>[] is not retroactively applicable on collateral review." <u>Smith v.</u>

-10-

<u>Stein</u>, 982 F.3d 229, 235 (4th Cir. 2020).[4]  The Fourth Circuit began its analysis by discussing the holding in <u>McCoy</u>:

> In <u>McCoy</u>, the [United States Supreme] Court held that the Sixth Amendment guarantees a defendant the right to choose the objective of his defense and to insist that his counsel refrain from admitting guilt.  The <u>McCoy</u> [c]ourt explained that this right exists even when a defendant's counsel concludes that confessing guilt offers the defendant the best chance to avoid the death penalty.
>
> McCoy had "vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt." <u>Id.</u> at 1505.  But at the guilt phase, and again at the penalty phase, of McCoy's capital trial, the trial court permitted defense counsel to concede McCoy's guilt. <u>Id.</u> at 1506-07.  The trial court reasoned that it was the attorney's task to determine how to best present his client's case.  <u>Id.</u>
>
> The [United States] Supreme Court rejected this rationale and reversed, holding that the right to counsel under the Sixth Amendment includes a right to "[a]utonomy to decide that the objective of the defense is to assert innocence." <u>Id.</u> at 1508.  Although "[t]rial management is the lawyer's province," counsel is "still an assistant" to the defendant and "may not override [her client's objections] by conceding guilt." <u>Id.</u> [at] 1508-09 (citation and internal quotation marks omitted).  Therefore, once a defendant "communicate[s] [his objection] to court and counsel, . . . . a concession of guilt should [be] off the table." <u>Id.</u> at 1512.  The

---

[4]  Petitioner asserts that the MAR court's failure to "conduct[ any] analysis whatsoever of Petitioner's claim pursuant to <u>McCoy v. Louisiana</u>[,]. . . . fail[ure] to even acknowledge binding Supreme Court precedent, which was decided <u>prior</u> to the [MAR] being filed, and [] fail[ure] to apply the structural error standard to the claim [renders] the state courts' decisions [] contrary to, and [] unreasonable applications of, binding Supreme Court precedent." (Docket Entry 1 at 30; <u>see also</u> Docket Entry 6 at 3.)  That argument misses the mark, because the United States Supreme Court has held that "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does <u>not</u> require that there be an opinion from the state court explaining the state court's reasoning," <u>Harrington v. Richter</u>, 562 U.S. 86, 98 (2011) (emphasis added), and that "a state court need not cite or even be aware of [United States Supreme Court] cases under § 2254(d)," <u>id.</u> (citing <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (per curiam)).

[c]ourt further concluded that a violation of this right constitutes structural error and requires "a new trial without any need first to show prejudice." Id. at 1511.

Smith, 982 F.3d at 232.

The Smith court then observed that "[t]he principles articulated in Teague v. Lane, 489 U.S. 288 (1989), and its progeny guide[d the] analysis of . . . whether a rule [the United States Supreme Court] has announced should be applied retroactively to final judgments in criminal cases." Smith, 982 F.3d at 233 (citing Teague, 489 U.S. at 310). "[A] 'new rule' applies retroactively in a collateral proceeding," the Fourth Circuit noted, "if the rule is substantive, rather than procedural, or if it is a 'watershed rule of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Id. (quoting Whorton v. Bockting, 549 U.S. 406, 416 (2007) (internal quotation marks and brackets omitted)). The Fourth Circuit declined to decide whether the McCoy decision announced a new rule, because "the *McCoy* rule is not substantive," id., and it "did not establish a watershed rule," id. at 234.

In light of the non-retroactivity of McCoy, "the [MAR] court need[ed] only apply the constitutional standards that prevailed at the time the original proceedings took place." Teague, 489 U.S. at 306 (internal quotation mark omitted). As the Fourth Circuit recognized, an earlier United States Supreme Court decision supplied the prevailing constitutional standard at the time of Petitioner's trial in May 2016:

> Prior to McCoy, the [United States] Supreme Court had viewed a lawyer's concession of guilt as a tactical

-12-

choice that counsel could make — in the absence of her client's consent — without exceeding constitutional limitations. In <u>Florida v. Nixon</u>, the [c]ourt had determined that the Constitution does not bar counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects." 543 U.S. 175, 178[ ] (2004). Rejecting "a blanket rule demanding defendant's explicit consent," <u>Nixon</u> unanimously determined that such an admission was not automatically prejudicial ineffective assistance of counsel. <u>Id.</u> at 192[].

<u>Smith</u>, 982 F.3d at 233.[5] Thus, as the Fourth Circuit observed, <u>Nixon</u> did not view counsel's concession of a client's guilt as structural error outside the ambit of harmlessness analysis, but rather, as an allegation regarding the ineffectiveness of counsel subject to the standards announced in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>See</u> <u>Smith</u>, 982 F.3d at 234.

The Fourth Circuit has provided guidance in regards to the clearly established law governing ineffective assistance claims:

In order to establish an ineffective assistance of counsel claim . . ., [a petitioner must] establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [<u>Strickland</u>, 466 U.S. at 688], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694. "Unless a [petitioner] makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id.</u> at 687.

_____

[5] Some district courts determined, prior to the Fourth Circuit's issuance of <u>Smith</u>, that the rule announced in <u>Nixon</u> did not apply to non-capital cases. <u>See, e.g.</u> <u>Sumter v. Warden, Lieber Corr. Inst.</u>, No. CV 4:16-0739, 2016 WL 7647566, at *7 (D.S.C. Dec. 13, 2016) (unpublished) (citing <u>Bergerud v. Falk</u>, No. 14CV2728, 2015 WL 5770946 (D. Co. October 2, 2015) (unpublished)), <u>recommendation adopted</u>, 2017 WL 633816 (D.S.C. Feb. 16, 2017). However, <u>Smith</u> did not involve the death penalty, <u>see</u> <u>Smith</u>, 982 F.3d at 231, and yet the Fourth Circuit found that <u>Nixon</u> provided the governing standard, <u>see</u> <u>id.</u> at 233. Accordingly, this Recommendation will apply <u>Nixon</u> as clearly established federal law governing Ground One.

In determining whether counsel's performance was deficient, "[i]t is all too tempting for a [petitioner] to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." Id. (internal quotation marks omitted).

Similarly, in evaluating whether [a petitioner] has shown actual prejudice from any such deficient performance, it is insufficient for the [petitioner] "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." Id. at 693. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." Id. at 694. When challenging a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695.

Fisher v. Lee, 215 F.3d 438, 446-47 (4th Cir. 2000) (parallel citations omitted).

Moreover, the United States Supreme Court has cautioned that "[s]urmounting Strickland's high bar is never an easy task. . . . Even under de novo review, the standard for judging counsel's representation is a most deferential one." Harrington v. Richter, 562 U.S. 86, 105 (2011) (internal quotation marks omitted). Further, "[w]here the issue is whether the state court has unreasonably applied Strickland standards to a claim of ineffective assistance of counsel, . . . double deference is required . . . ." Lavandera-Hernandez v. Terrell, No. 1:12CV553, 2013 WL 1314721, at *4 (M.D.N.C. Mar. 28, 2013) (Schroeder, J.)

-14-

(unpublished) (internal quotation marks omitted), <u>appeal dismissed</u>, 539 F. App'x 159 (4th Cir. 2013); <u>see also</u> <u>Harrington</u>, 562 U.S. at 105 ("The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." (internal citations and quotation marks omitted)). Accordingly, when the Court's examination of an ineffective assistance claim proceeds under Section 2254(d), "[t]he question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Harrington</u>, 526 U.S. at 105.

In other words, "under the dual, overlapping lenses of [Section 2254(d)] and <u>Strickland</u> [the Court must] ask[] the following question: Was the [state] court's holding incorrect to a degree that its conclusion was so lacking in justification that it was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement?" <u>Moore v. Hardee</u>, 723 F.3d 488, 496 (4th Cir. 2013) (internal brackets, ellipses, and quotation marks omitted). Under this standard, the Court should conclude that the MAR court neither contradicted nor unreasonably applied <u>Nixon</u> and <u>Strickland</u> in denying Petitioner's parallel claim in her MAR.

1. <u>Deficient Performance</u>

a. Duress Instruction

Petitioner first contends that her trial counsel "directly deprived [] Petitioner of her Constitutional right to make . . . the choice to maintain her innocence" by conceding the applicability of, and failing to request, a duress instruction.

-15-

(Docket Entry 1 at 28.)  In that regard, Petitioner points out that she "gave incriminating statements to law enforcement upon her arrest, and made further incriminating statements to her husband at the police station that were videorecorded in which she admitted to sexual contact with the complainant." (Id.)  Thus, Petitioner argues, after denial of trial counsel's motion to suppress those statements, "the jury would hear what the prosecution would characterize as a confession," and trial "[c]ounsel proceeded to trial knowing that duress would be the only avenue of defense, and that [Petitioner]'s testimony would [be] the only evidence to support the theory of defense." (Id.)  Petitioner maintains that, despite that knowledge, trial "counsel conceded that no jury instruction on duress would be appropriate, even before the trial court received any defense testimony," such that "the duress defense was dead on arrival." (Id. at 29.)  As discussed in more detail below, Petitioner has failed to show deficient performance under Strickland by her trial counsel with regard to the duress instruction.

After the prosecution finished presenting its evidence, trial counsel advised the prosecution that he intended to present Therapist Millan as a witness, and the prosecution objected on the grounds that trial counsel had failed to provide the prosecution with the required advance notice of an expert witness. (See Docket Entry 1-2 at 382-84.)  Thereafter, the following discussion took place between the trial court, trial counsel, and the prosecution:

> [TRIAL COUNSEL]: I can tell the [trial c]ourt I am not tendering [Therapist Millan] as an expert.  I'm tendering

-16-

her to corroborate some of the things that we anticipate
that [Petitioner] is going to say.

. . .

T[RIAL] COURT: What specifically would the substance of
her testimony be?

[TRIAL COUNSEL]: Well, I think that she can just provide
her lay opinion about how [Petitioner], the demeanor of
[Petitioner] during that time period. . . . I know the
jury is going to have questions about how quickly
[Petitioner], you know, spoke with the officer and
questions about how she appeared in that video, the
demeanor of her during that video. I know [Petitioner]
can answer that but I think [Therapist] Millan can
corroborate or give an opinion about why someone might
behave in that fashion.

T[RIAL] COURT: That sounds like you are asking someone to
offer some type of expert opinion based on their
training, skill, knowledge, experience that could in some
way interpret what [Petitioner] did at various times and
put them in some context to sort of explain her
motivations. . . . [I]t sounds like that is the exact
territory that an expert would offer an opinion on, that
a lay person would not be qualified to offer an
explanation as to [Petitioner]'s actions based on some
number of conversations that took place. So, first of
all, I think it would require her to be properly
qualified and tendered as an expert witness. . . . Based
on the charges, . . . it does not appear that
[Petitioner]'s state of mind is even relevant on the
issue of guilt or innocence.

. . .

[TRIAL COUNSEL]: Well, it is relevant, your Honor, you
know, this is referred to as a straight liability
offense. . . . <u>It is relevant, in my opinion, because it
-- well, it explains the duress that she felt in this
situation. And I know what the standard is for duress.
You know, we are not alleging that he put a gun to her
head. We are not alleging that he had a knife and forced
her to do anything, but what we are arguing is that he
pressured her. He used that type of coercion and that
she didn't willingly do any of these things that she
admits that she did. It was not her intent. She didn't
want to do that. She didn't want to go down that road.</u>
And he used the very fact that she knew she would get in
trouble to induce her to continue to engage in these
acts.

-17-

T[RIAL] COURT: <u>So this is offered ultimately to show to the jury that your client was forced to act</u>?

[TRIAL COUNSEL]: <u>Yes</u>.

(<u>Id.</u> at 384-89 (emphasis added).)

The prosecution then contended that trial counsel had failed to provide the prosecution with the required advance notice of the affirmative defense of duress under Section 15A-905(c)(1) of the North Carolina General Statutes (<u>id.</u> at 389-90), and trial counsel responded as follows:

> [TRIAL COUNSEL]: I know you have to give notice of an affirmative defense.  I guess, I mean -- you know, <u>we have been over this, meaning I have considered that. What I'm saying . . . is that the defense that we are raising, I don't even -- I have considered it and I don't believe that you would be inclined to give an instruction to the jury to consider the defense of duress.  Because I am not arguing, I am not going to argue nullification,</u> what I want to argue and what I want them to consider is her state of mind and what she felt. . . .
>
> T[RIAL] COURT: [D]id I understand you to say although you wanted to present this evidence before the jury, you would not actually be asking for a duress instruction? . . . [I]f you are not even going to be requesting a duress instruction, why should I allow you to do it?
>
> [TRIAL COUNSEL]: Well, your Honor. This is my argument, and <u>I am going to go back and say I would argue for you to instruct the jury on duress</u>.  I don't want to say --
>
> T[RIAL] COURT: Tell you what, I will cut you off.  I don't do that a lot. . . .  Generally I let lawyers just try to persuade me until they have had enough.  At this point, though, I think it might be fruitful for us to be in chambers for just a moment. . . .  We will come back out and resume arguments if necessary.  I will bring my laptop back so you can look at this instruction and we can go from there. . . .  The attorneys will accompany me to the chambers.

(<u>Id.</u> at 390-93 (emphasis added).)  After a brief, in-camera discussion, the following colloquy took place:

-18-

> [TRIAL] COURT: Let the record reflect that the [c]ourt did meet for a moment with the [prosecution] and [trial counsel] to discuss testimony from [Therapist] Millan. <u>The [c]ourt thought it prudent to allow the attorneys to review the pattern jury instruction that specifically deals with issues concerning coercion and duress. After reviewing that, it appears that that is not an instruction that would be suitable for the facts of this case. And I believe [trial] counsel [] acknowledges that would not be appropriate based on the facts of this case; is that correct</u>?
>
> [TRIAL COUNSEL]: <u>That is correct</u>.

(<u>Id.</u> at 393-94 (emphasis added).)[6]

In light of those circumstances, any claim that her trial counsel violated <u>Nixon</u> by "conced[ing] that no jury instruction on duress would be appropriate" or by failing to request a duress instruction (Docket Entry 1 at 29) falls short. The record establishes that, despite some initial (and apparently well-founded) doubt regarding the instruction's applicability to the case, trial counsel ultimately did request that the trial court instruct the jury on duress (<u>see</u> Docket Entry 1-2 at 382-93) and, after an in-chambers discussion, the trial court found the instruction "not . . . suitable for the facts of th[e] case" (<u>id.</u> at 394). Thus, the unavailability of the duress instruction resulted not from the ineffectiveness of trial counsel but rather from a ruling of the trial court.

---

[6] The trial court thereafter ruled that Therapist Millan's testimony lacked relevance and that, under Rule 403 of the North Carolina Rules of Evidence, the prejudicial effect of that testimony outweighed any probative value. (Docket Entry 1-2 at 394.) The trial court later reconsidered that ruling "in light of [Petitioner's] testimony" that raised "an issue regarding why [she wa]s able to come forth [at trial], in her words, fully instead of telling the whole truth at the beginning of this investigation" (<u>id.</u> at 494), and permitted Therapist Millan to testify for the limited purpose of corroborating Petitioner's testimony, but precluded her from offering any expert opinions (<u>see</u> <u>id.</u> at 494-96).

-19-

Moreover, even if trial counsel had entirely failed to request a duress instruction, Petitioner could still not establish deficient performance under Nixon, because Petitioner has not shown that such a request would have succeeded. "'It is generally held . . . that duress must consist of threatening conduct which produces in the defendant (1) a reasonable fear of (2) immediate (or imminent) (3) death or serious bodily harm.'" State v. Brower, 289 N.C. 644, 657, 224 S.E.2d 551, 561 (1976) (quoting LaFave & Scott, Handbook on Criminal Law, § 64, at 377 (1972)); see also N.C.P.I. - Crim. 310.10 ("The defendant would not be guilty of this crime if her actions were caused by a reasonable fear that she (or another) would suffer immediate death or serious bodily injury if she did not commit the crime.").

Petitioner testified that, on one occasion, the 13-year-old victim grabbed her by the forearms, turned her around, pulled her pants down, and penetrated her anally against her will (Docket Entry 1-2 at 435-39; see also id. at 478) and, on another occasion a couple of weeks later, held her head down and forced her to perform oral sex on him (see id. at 452-57). Petitioner additionally stated that the victim "told [her] after that first time [of sexual contact between them], if [she] t[old] anyone [she was] going to jail" (id. at 433; see also id. at 444, 459, 475, 480, 491). That testimony, however, falls short of establishing that Petitioner committed the sexual offenses with the 13-year-old victim under "a reasonable fear of immediate (or imminent) death or

-20-

serious bodily harm," Brower, 289 N.C. at 657 (emphasis added) (parenthetical numbering omitted).

Furthermore, Petitioner admitted that, during the first alleged assault, she did not yell out to get the attention of others present in the home (see id. at 479-80, 491-92) or "try to punch [the victim] or hurt him" (id. at 479), as well as that, after the victim allegedly sodomized her, she did not go to the hospital (see id. at 448-49, 480). Petitioner additionally admitted that she failed to report any of the victim's alleged inappropriate and/or assaultive conduct to his parents, her employer, her husband, other family members, or the authorities (see id. at 447-48, 452, 457-58, 459, 477-78, 480) and, after the first alleged assault, voluntarily returned to the victim's home and continued her job as a home health services provider where additional allegedly involuntary sexual acts subsequently occurred between Petitioner and the victim (see id. at 447, 482). A duress instruction does not apply where a defendant "had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm." State v. Kearns, 27 N.C. App. 354, 357, 219 S.E.2d 228, 231 (1975) (citing 40 A.L.R.2d 908 (1955)). Accordingly, trial counsel could not have supplied deficient performance regarding his handling of the duress instruction where the instruction (as the trial court recognized) did not apply to the facts of the case. See Oken v. Corcoran, 220 F.3d 259, 269 (4th Cir. 2000) ("[C]ounsel [i]s not constitutionally ineffective

-21-

in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

Petitioner's allegations also fail to show deficient performance by trial counsel under <u>Nixon</u> and <u>Strickland</u> because, even assuming trial counsel conceded the inapplicability of a duress instruction (which the record shows he did not), that concession did not constitute an admission of Petitioner's guilt. Petitioner's testimony that she did not willingly engage in any of the sexual acts with the victim reflects the absence of the required mens rea. <u>See</u> <u>State v. Sines</u>, 158 N.C. App. 79, 86, 579 S.E.2d 895, 900 (2003) (recognizing that, although so-called strict liability sexual offenses against children do not require intent to engage in a sexual act with a child, they do require "inten[t] to commit a sexual act with the victim"). Thus, even without a duress instruction, if the jury had believed Petitioner's testimony, it could have found her not guilty on the basis that she lacked the intent to commit any sexual acts with the victim.[7]

---

[7] For those same reasons, Petitioner's reliance on <u>People v. Yagudayev</u>, 91 A.D.3d 888, 937 N.Y.S.2d 279 (N.Y.A.D. 2d Dep't 2012) misses the mark. According to Petitioner:

> the defendant [in <u>Yagudayev</u>] testified and admitted to <u>intending</u> to steal [a box of] tools but maintained he did not have the opportunity to do so because he was stopped by security before leaving the premises. Thus, counsel's strategy was to present the defendant's testimony to that effect in order to establish that the defendant only committed the less[er]-included offense of attempted larceny, rather than a completed larceny. The New York Supreme Court, Appellate Division, Second Department held on direct appeal that trial counsel was ineffective. Based upon New York law, the larceny was completed the moment the defendant hid the tools in the box. By eliciting from defendant what amounted to an admission of guilt, counsel embarked on a "legally unsound" theory of defense that was "inexplicably prejudicial." <u>Id.</u> at 891-892. Here, like <u>Yagudayev</u>, [trial] counsel embarked on a legally unsound theory of
> (continued...)

In sum, Petitioner has not shown constitutional ineffectiveness by trial counsel regarding his handling of the duress instruction.

b.   Closing Arguments

Petitioner additionally argues that her trial counsel "directly deprived [] Petitioner of her Constitutional right to make . . . the choice to maintain her innocence" (Docket Entry 1 at 28) by "fail[ing] to argue during his closing statement that Petitioner was not guilty" (id. at 29).  Petitioner notes that trial counsel's "closing arguments were not transcribed in this case for reasons unknown" (Docket Entry 6 at 5) but that, "[i]n [Petitioner's MAR], as in the instant [P]etition, [she] alleged[ that, d]uring trial counsel's closing argument, he argued that the jury's verdict would be permanent, [] spoke about [Petitioner]'s upbringing[, and ] never argued that [Petitioner] was under duress or forced to commit the acts for which she was charged" (id. (citing Docket Entry 1 at 29, Docket Entry 1-10 at 27-29 (Affidavit of Petitioner), ¶ 7, Docket Entry 1-10 at 30-32 (Affidavit of Sandra Pruitt), ¶ 5)).  Petitioner additionally faults trial counsel for "not draw[ing] upon [Petitioner's] testimony or the testimony of [Therapist] Millan at all" in closing arguments.

---

⁷(...continued)
defense – one that he had waived, in Petitioner's absence, prior to putting her on the witness stand to essentially admit guilt.

(Docket Entry 6 at 6 (emphasis added) (internal paragraph numbering omitted).) As emphasized above, in Yagudayev, the defendant's trial counsel permitted the defendant to testify that he intended to steal the tools, see Yagudayev, 91 A.D.3d at 891, 937 N.Y.S.2d at 283, whereas in this case, Petitioner's testimony that the victim coerced her into sexual acts, if believed, demonstrated a lack of mens rea.

-23-

(Docket Entry 1 at 29.)  Petitioner deems "[s]ignificant[]" the facts that "neither the State nor Petitioner's [trial] counsel denied this [description of trial counsel's closing argument] in the State's response to the [MAR] or the affidavit [trial] counsel submitted in opposition," and that "Respondent [failed to] claim in [response to] this [P]etition that no such argument was ever made." (Docket Entry 6 at 5.)  Thus, Petitioner argues, "in the absence of any evidence to the contrary, this Court must presume that trial counsel argued as indicated above."  (Id.)

Here, the MAR court did not contradict or unreasonably apply Nixon or Strickland by "conclud[ing] as a matter of law that no substantial issues of fact exist which would otherwise require an evidentiary hearing," and that Petitioner's "points of contention fail[ed] based upon the record."  (Docket Entry 1-12 at 1.)  Even taking all of Petitioner's allegations regarding trial counsel's statements during closing arguments as true, Petitioner has not established that her trial counsel admitted Petitioner's guilt in violation of Nixon.

In Nixon, a capital murder case, trial counsel "concluded that the best strategy would be to concede guilt, thereby preserving his credibility in urging leniency during the penalty phase," Nixon, 543 U.S. at 181 (emphasis added), and told the jury during opening statements that "there wo[uld]n't be any question, none whatsoever, that [his] client, [the defendant], caused [the victim]'s death," as well as that his client's guilt "w[ould] be proved to [the jury's] satisfaction beyond any doubt," id. at 182.  In his closing

-24-

argument, [trial counsel] again conceded [the defendant]'s guilt."
Id. at 183.

In contrast to the facts in Nixon, Petitioner here alleges only that trial counsel focused his closing arguments on Petitioner's upbringing and a request for leniency, and does not contend that he ever expressly conceded her guilt to the jury. (See Docket Entry 1 at 29; see also Docket Entry 1-10 at 27-29 (Affidavit of Petitioner), ¶ 7; Docket Entry 1-10 at 30-32 (Affidavit of Sandra Pruitt), ¶ 5; Docket Entry 6 at 5.) Petitioner cites no binding or persuasive authority for the proposition that trial counsel's strategic decision to focus closing arguments on humanizing Petitioner and asking for leniency amounts to a concession of guilt under Nixon (see Docket Entry 1 at 25-30; see also Docket Entry 6 at 5-6), and the undersigned's research has not revealed any such authority.[8]

---

[8] After the prosecution's direct examination of the victim, the trial court addressed Petitioner outside the presence of the jury as follows:

[TRIAL COURT:] [T]here was a statement during the opening from your attorney that did you not willingly have any type of sexual relations with [the victim]; do you recall that?

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And did you discuss that with your attorney at some point?

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And he told the jury that with your consent also?

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And that's fine with you?

[PETITIONER:] Yes, Your Honor.

(continued...)

-25-

In light of the foregoing analysis, Petitioner has not shown deficient performance by trial counsel with respect to his closing arguments.[9]

2. <u>Prejudice</u>

Even assuming, <u>arguendo</u>, that Petitioner could show deficient performance by trial counsel under <u>Nixon</u> and <u>Strickland</u>, in light of the strong to overwhelming evidence against Petitioner, she cannot meet the high standard for prejudice under <u>Strickland</u>. That evidence included 1) the victim's testimony that Petitioner willingly engaged in open-mouthed kissing, sexual touching, anal

---

[8](...continued)
(Docket Entry 1-2 at 159-60 (emphasis added).) Thus, Petitioner admitted in open court that trial counsel did forecast to the jury in his opening statement that Petitioner would later testify that she did not engage in the sexual acts with the victim willingly.

[9] Petitioner argues that, "'where specific allegations before the court show reason to believe that the petitioner may, <u>if the facts are fully developed</u>, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.'" (Docket Entry 6 at 6-7 (emphasis added) (brackets omitted) (quoting <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09, (1997)).) According to Petitioner, she "tried everything in her power to develop a factual basis for her post-conviction claims by requesting an evidentiary hearing in the state court, and appealing that decision[, but t]he State [] successfully defeated these two bids." (<u>Id.</u> at 7.) Petitioner points out that "a Federal habeas petitioner cannot be penalized for <u>failing to develop a sufficient factual basis of a claim</u> in state court proceedings if the applicant has diligently sought to develop the factual basis of a claim for habeas relief but has been denied the opportunity to do so by the state court." (<u>Id.</u> (emphasis added) (citing <u>Williams</u>, 529 U.S. at 420, <u>Cardwell v. Greene</u>, 152 F.3d 331 (4th Cir. 1998)).) Petitioner thus requests that the Court "hold the evidentiary hearing that should have been held in the state court." (<u>Id.</u>) Petitioner's inability to persuade the MAR court to hold an evidentiary hearing does not equate to a "fail[ure] to develop the factual basis of a claim in State court proceedings" under 28 U.S.C. § 2254(e)(2), and therefore does not subject her to Section 2254(e)(2)'s heightened standard for obtaining an evidentiary hearing. <u>Cardwell</u>, 152 F.3d at 338. However, Petitioner has not demonstrated entitlement to an evidentiary hearing, because "[a]n evidentiary hearing is permitted only when the petitioner alleges additional facts that, if true, would entitle h[er] to relief," and Petitioner "has failed to forecast any evidence beyond that already contained in the record, or otherwise to explain how h[er] claim would be advanced by an evidentiary hearing." <u>Id.</u> (internal quotation marks omitted).

-26-

and vaginal intercourse, and oral sex with him (Docket Entry 1-2 at 132-46, 174-91, 202, 206); 2) Detective (now Sargeant) Ben Clayton's testimony that Petitioner admitted to engaging in oral sex with the victim in his patrol car prior to Petitioner's arrest (id. at 311); and 3) Petitioner's video-recorded confessions to Detective Clayton and to her husband after her arrest and <u>Miranda</u> warnings in the police station (id. at 313-17, 331, 337-39, 342-43, 353-56, 359-60).[10]

Moreover, the jury heard Detective Clayton read aloud the following statement that he wrote to summarize the substance of his interview of Petitioner and that Petitioner approved and signed:

> I, [Petitioner], want to make the following statement: I am a CNA and I was taking care of [the victim's disabled younger brother]. I usually go there six days a week, not on Thursdays, to help [him]. During the time I was helping [him], I also helped [the victim] with his homework. I didn't spend a lot of time with [the victim] at first. <u>The first time [the victim] and I had oral sex was in the basement</u>. There was no one else around when these incidents happened. <u>I only gave [the victim] oral sex at the most, three times. We also had anal sex, no more than twice</u>. On Tuesday, November 11, 2014, <u>[the victim] and I messed around sexually</u>, but he never made it inside of me. On Wednesday, November 1[2], [] 2014, <u>we had sex vaginally, in the basement</u>. That was the first and only time.

(<u>Id.</u> at 349 (emphasis added); <u>see also</u> <u>id.</u> at 338, 345 (reflecting that Petitioner signed statement and did not make any corrections).)

---

[10] The record does not contain transcriptions of those video-recorded confessions.

-27-

Detective Clayton also read aloud to the jury an additional statement Petitioner herself wrote and signed beneath Detective Clayton's portion of the statement:

[Petitioner] never meant any harm to the [victim's] family. They were nothing but loving and caring to me. I know that things will never be the same between us, but I do pray that your family goes far and beyond what you could ever imagine. I know and I have known what I did was wrong. I have loved you all like my family. I feel awful because [the victim's disabled younger brother] will suffer the worse, because he will not know where [Petitioner] is. . . . I did no harm to [victim's brother] and [victim's other brother]. I'm also sorry to you too [victim]. I knew from the first time I kissed you that it went too far. I pray that one day you can forgive me as a family. I will forever miss you. You showed me a whole new life. You have such a beautiful family, and I know this too shall pass. I know that we will never get to say our goodbyes, but if I could now say goodbye to my little man who is the most precious child on this earth that I do love you. I know things have changed now, but [victim's mother] and [victim's father], you were like a second mom and dad to me. I know I'm sorry will not fix anything, but me hurting this family was never in my intent. I know I will also be going through my own struggles with [my husband] Codey. I pray he will also forgive me for not only being unfaithful, but lying as well. I know lying will get you no where [sic]. I also would like to say bye to [victim's brother]. You were also my best buddie [sic] like [victim's other brother] I always enjoyed snuggling with you both eating popcorn and watching Star Wars or reading you your book. And again I know this is something that will not go back to as the same, but I will always love you as part of my family. I do understand and agree that I will probably never see you again for pain and law reasons, but I truly am sorry that I put your family and mine through something that could have easily been avoided. I know that this is added craziness that is not needed for you, and my whole job was to help destress that for you. I know what I did with [the victim] went too far. I know I am in the wrong. I never meant any harm to anyone. I know this will pass, and life will go on. I only wish the best for you. I know this road will be a long road for me. I know God will work after all of us. I know sorry isn't going to cut it at all, but even though lines were crossed with [the victim] and I, I saw all of you as my family. I know none of this will go away overnight, but

-28-

I want you to know that you all mean the world to me. I
never thought I would be in this situation. I have never
sexually involved another child. My husband and [the
victim] are the only sexual relations I have ever had.
I pray that the [victim's family], my husband, my family,
and God have mercy on my soul. I'm going to miss all of
your smiling faces. I pray and wish the best for you
all.

(Id. at 350-52 (emphasis added).)

Under these circumstances, Petitioner's allegations do not
come close to establishing a reasonable probability of a different
outcome for Petitioner's trial. See Mueller v. Angelone, 181 F.3d
557, 586 (4th Cir. 1999) ("In the face of [the] defendant's
videotaped confession and the powerful evidence derived therefrom,
it is virtually impossible for us to imagine that he could carry
the burden of establishing prejudice from his [trial] counsel's
performance.").

In short, the MAR court's denial of Petitioner's parallel
claim, when viewed through the lens of Section 2254(d) deference,
must stand, and Ground One fails as a matter of law.

B. Ground Two

Via Ground Two, Petitioner contends that "the state court
decision denying post-conviction relief based upon Petitioner's
ineffective assistance of counsel claim was contrary to
clearly-established [United States] Supreme Court precedent; in the
alternative, it was based upon an unreasonable application of
clearly-established federal law." (Docket Entry 1 at 31 (standard
capitalization applied, bold font and single-spacing omitted).) In
particular, Petitioner faults her trial counsel for not providing
timely notice to the prosecution of the duress affirmative defense

-29-

and Therapist Millan's status as an expert witness (see id. at 34), as well as for conceding the inapplicability of a duress jury instruction and then permitting Petitioner to testify that she engaged (albeit unwillingly) in sexual acts with the victim (see id. at 34-35). According to Petitioner, the MAR "court did not identify the correct governing legal standard in this case as set forth in Strickland[,] . . . failed to conduct any legal analysis, failed to make any findings of fact, a[s well as] simply summarily denied post-conviction relief in a conclusory matter[ and, i]n so doing, . . . unreasonably applied the principles of Strickland and also reached a result opposite to the one reached by the [United States] Supreme Court on the same question of law." (Id. at 36.)[11] Those contentions fall short.

1. Notice of Affirmative Defense and Expert Witness

Petitioner first argues her trial counsel performed deficiently by "fail[ing] to provide requisite notice to the prosecution that the affirmative defense of duress and/or expert testimony would be presented, resulting in preclusion of some defense evidence," and by not "contact[ing] the expert witness [Therapist] Millan until the trial was already underway." (Id. at 34.) According to Petitioner, "[i]t was undisputed that from the

_____

[11] Petitioner's argument that the MAR court's "fail[ure] to conduct any legal analysis[ or] to make any findings of fact" results in the MAR court unreasonably applying or contradicting Strickland (Docket Entry 1 at ) fails for the reasons discussed in Ground One, i.e., "determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning," Harrington, 562 U.S. at 98 (emphasis added), and "a state court need not cite or even be aware of [United States Supreme Court] cases under § 2254(d)," id. (citing Early, 537 U.S. at 8).

start of [trial] counsel's representation, Petitioner told him that she committed the offenses under duress," and "that the case might involve the use of a defense expert, as Petitioner told [trial] counsel that she was seeing a therapist, and why." (Id.) Thus, Petitioner insists, trial counsel's failure to timely notify the prosecution of the duress defense and Therapist Millan's status as an expert witness, as well as his failure to contact Therapist Millan until the time of trial, qualify as "objectively unreasonable" representation on trial counsel's part. (Id.)

As the colloquy between the trial court, the prosecution, and trial counsel quoted above in the discussion of Ground One makes clear, the trial court did <u>not</u> deny Petitioner the right to argue the affirmative defense of duress because of trial counsel's failure to give the prosecution the requisite advance notice, but rather, because the duress instruction "would [not] be suitable for the facts of th[e] case." (Docket Entry 1-2 at 394.) Thus, even assuming trial counsel neglected to give the prosecution timely notice of the duress defense, where the trial court nevertheless considered the merits of the defense and ruled it inapplicable, Petitioner cannot show that her trial counsel's failure to notify the prosecution of the duress defense prejudiced her.

Similarly, that colloquy shows that trial counsel <u>did not intend to (and did not) proffer Therapist Millan as an expert witness</u> but rather offered her as a lay witness to corroborate Petitioner's state of mind during and after the sexual incidents with the victim. (<u>See</u> <u>id.</u> at 384-85.) Moreover, the trial court

-31-

ultimately permitted Therapist Millan to testify to corroborate Petitioner's testimony. (Id. at 494-96.) Thus, the question of deficient performance turns on the reasonableness of trial counsel's tactical decision to offer Therapist Millan as a lay witness rather than as an expert witness, and not whether trial counsel failed to give the prosecution timely notice of Therapist Millan. As explained more fully below, even assuming, arguendo, that Petitioner could show deficient performance, Petitioner cannot demonstrate prejudice under Strickland arising from trial counsel's decision to call Therapist Millan as a lay witness.

Therapist Millan submitted an Affidavit to the MAR court in which she outlined the testimony she would have given as an expert witness:

> I was not permitted to testify as to my impressions and diagnoses of [Petitioner]. Had I been permitted to testify as to those issues, I would have testified consistently with the records of my treatment of her, which were as follows, in sum and substance:
>
> > [Petitioner] seems to be naive to the everyday nuances of today's society and to have been very protected and brought up with strong morals and good judgment.
> >
> > [Petitioner] has way above average protective instincts and will sacrifice herself in order to always protect someone else.
> >
> > [Petitioner] seems to have little boundaries around self care, and will go way beyond what most people would do, in order to help someone else.
> >
> > [Petitioner] is very fearful and anxious at this time, but her anxiety and fear seem to be more for her family and others than for herself.

> [Petitioner] suffered from feelings of guilt,
> a history of abuse, depression, anxiety, and
> post-traumatic stress disorder.
>
> Had I been permitted to so testify and if I had been
> asked on the witness stand, I would have amplified and
> explained those impressions and diagnoses, and the
> treatment methods I employed to assist [Petitioner] in
> coping with these issues.
>
> [Petitioner] struggled with using the word "rape," even
> though what she described to me clearly fit the
> definition. She became visibly emotional when we touched
> on the topic, and blamed herself for failing to stop the
> complaining witness from sexually assaulting her. Had I
> been asked, I would have testified to those facts, and my
> resulting impression of her suffering from post-traumatic
> stress disorder as a result of her being the victim of a
> sexual assault. I would have also testified that her
> feelings and symptoms were consistent with those of a
> person who had been the victim of a sexual assault.

(Docket Entry 1-10 at 33-34 (internal parenthetical numbering omitted).)

The record demonstrates that Therapist Millan actually testified at trial about many of the topics outlined in the above-quoted excerpt from her Affidavit. For example, Therapist Millan testified that she worked with Petitioner "on building her self-esteem and her confidence, [and] helping her with <u>depression</u> and some <u>post-traumatic stress disorder</u>." (Docket Entry 1-2 at 530 (emphasis added).) In addition, Therapist Millan stated her impressions that Petitioner "didn't have much of a voice, . . . was very scared[,] . . . very immature, very young, [and] very naïve." (<u>Id.</u> at 531.) At that point, Therapist Millan described what Petitioner had told Therapist Millan during their therapy sessions:

> In the beginning [Petitioner] felt a lot of guilt and
> shame. She felt that she was there to protect and do her
> job to take care of [the victim's disabled younger
> brother]. She felt that she had not been able to stop

-33-

the sexual acts from happening. She felt that she had tried. She felt that she had many times that he had approached her and told her that she, that he would tell the police or tell someone that and she would be arrested. She felt that she was very concerned because she had originally -- she had saved herself for marriage before having sex and she had only one partner. She felt very guilty that she had had to have sex with someone else. She felt very responsible as the adult that she should have been able to do something to stop it, but as much as she tried, she couldn't. She said she described several of the sexual acts that have been done to her. . . . [The victim] pulled [Petitioner's] pants down, then he had sex with her from behind. She said that he would push her head down and force her to have oral sex with him. . . . I had asked her if she said no. She said she had. But he would threaten her that he would tell if she didn't do what he wanted her to do.

(Id. at 532-33.)

Trial counsel then elicited the following testimony from

Therapist Millan:

[TRIAL COUNSEL:] Did you ask her why she continued to report to work?

[THERAPIST MILLAN:] Yes, I did.

[TRIAL COUNSEL:] What did she tell you about why she continued to?

[THERAPIST MILLAN:] She said because she had a very strong attachment to [the victim's disabled brother]. She felt very responsible to take care of him. She said that the previous person that was taking care of him he didn't get along with. He had gotten along with her and she really wanted to take care of him. She felt really responsible to take care of him.

. . .

[TRIAL COUNSEL:] Did she express any concerns to you about -- just any concerns in general?

[THERAPIST MILLAN:] She expressed a lot of concerns.

[TRIAL COUNSEL:] Please tell us what concerns she expressed.

-34-

> [THERAPIST MILLAN:] She expressed concerns for her husband. She expressed concerns for her family. She expressed a lot of concerns for [the victim's disabled brother]. She expressed a lot of concerns for every one but herself. She expressed concern about whether or not [the victim's disabled brother] would be properly taken care of. She expressed concerns about going to prison and what her husband would do and that she was very concerned for him and her family.

(Id. at 534-35.) Significantly, Therapist Millan not only corroborated Petitioner's testimony that the victim coerced her into sexual acts, but also bolstered Petitioner's explanation as to why she did not report the alleged assaults to anyone and continued to work in the victim's home after the first such assault. Indeed, comparison of Therapist Millan's proposed testimony in her Affidavit and her actual testimony at trial fairly reflects only two opinions that she did not have the opportunity to tell the jury: 1) that Petitioner "ha[d] way above average protective instincts and w[ould] sacrifice herself in order to always protect someone else" (Docket Entry 1-10 at 33); and 2) that Petitioner's "feelings and symptoms were consistent with those of a person who had been the victim of a sexual assault" (id. at 34).

Even assuming, arguendo, that the trial court would have permitted Therapist Millan, if timely proffered as an expert witness, to testify as to those two opinions, Petitioner still cannot demonstrate that trial counsel's performance prejudiced her. As outlined above, in light of the strong to overwhelming evidence of Petitioner's guilt, including the victim's testimony that Petitioner willingly engaged in sexual acts with him (see Docket Entry 1-2 at 132-46, 174-91, 202, 206), Detective Clayton's

testimony that Petitioner confessed to oral sex with the victim prior to her arrest (see id. at 311), Petitioner's video-recorded confessions to Detective Clayton and her husband (see id. at 313-17, 331, 337-39, 342-43, 353-56, 359-60), Detective Clayton's written summary of Petitioner's confession (see id. at 349; see also id. at 338, 345 (reflecting that Petitioner signed statement and did not make any corrections)), and Petitioner's written statement admitting guilt (see id. at 350-52), no reasonable probability of a different outcome at trial under Strickland arose from Therapist Millan's inability to offer the two opinions in question. See Mueller, 181 F.3d at 586 ("In the face of [the] defendant's videotaped confession and the powerful evidence derived therefrom, it is virtually impossible for us to imagine that he could carry the burden of establishing prejudice from his [trial] counsel's performance.").

## 2. Duress Instruction

Petitioner also faults her trial counsel for, "[a]t trial, before the defense presented any evidence, . . . agree[ing] that no duress instruction would be necessary," and "put[ting ] Petitioner on the witness stand and elicit[ing] another confession from her, admitting to engaging in sexual conduct with the complainant." (Docket Entry 1 at 34-35). In a footnote, Petitioner maintains that her "[t]rial counsel apparently misapprehended the law governing the affirmative defense of 'duress.'" (Id. at 34 n.9.) More specifically, Petitioner contends that "North Carolina Criminal Pattern Jury Instruction 310.10 and North Carolina case

-36-

law describe the affirmative defense as 'compulsion,' 'duress,' or 'coercion,'. . . [and] lump all three under the umbrella of the affirmative defense of duress." (Id.) According to Petitioner, "[w]hile 'duress' requires a reasonable fear of death or bodily harm, 'compulsion' or 'coercion' do not." (Id.)

As an initial matter, Petitioner cites no authority for the proposition that, at the time of her trial in 2016, North Carolina recognized compulsion and/or coercion as separate affirmative defenses from duress that did not require a showing of reasonable fear of immediate death or serious bodily harm. (Id.) In fact, in 2016, as described by the North Carolina Court of Appeals, the North Carolina pattern jury instructions required a showing of reasonable fear of immediate death or serious bodily injury for compulsion, duress, and coercion:

> 310.10 COMPULSION, DURESS, OR COERCION.
>
> There is evidence in this case tending to show that the defendant acted only because of [compulsion] [duress] [coercion]. The burden of proving [compulsion] [duress] [coercion] is upon the defendant. It need not be proved beyond a reasonable doubt, but only to your satisfaction. <u>The defendant would not be guilty of this crime if his actions were caused by a reasonable fear that he (or another) would suffer immediate death or serious bodily injury if he did not commit the crime.</u> His assertion of [compulsion] [duress] [coercion] is a denial that he committed any crime. The burden remains on the State to prove the defendant's guilt beyond a reasonable doubt.

<u>State v. Miller</u>, 258 N.C. App. 325, 330, 812 S.E.2d 692, 696 (2018) (emphasis added).[12]  Petitioner cannot fault her trial counsel for

---

[12] In June 2019, the University of North Carolina School of Government amended North Carolina Pattern Jury Instruction – Criminal 310.10 to reflect separate definitions for "compulsion," "duress," and "coercion."  N.C.P.I. – (continued...)

failing to request an instruction on "compulsion" or "coercion" when North Carolina did not recognize them as separate defenses from duress. See Oken, 220 F.3d at 269 ("[C]ounsel [i]s not constitutionally ineffective in failing to [take action if] . . . it would have been futile for counsel to have done so . . . .").

Moreover, as discussed above in the analysis of Ground One, trial counsel did not concede the inapplicability of a duress instruction. Rather, although trial counsel expressed initial doubt about whether the duress instruction would apply in the case, trial counsel ultimately requested the trial court to instruct the jury on duress (see Docket Entry 1-2 at 382-93) and, after the in-chambers discussion, the trial court announced that the duress defense did not apply to the facts of the case (see id. at 394).

Petitioner's attempt to show deficient performance arising out of trial counsel "put[ting ] Petitioner on the witness stand and elicit[ing] another confession from her" also misses the mark. (Docket Entry 1 at 34-35.) The record convincingly establishes that Petitioner insisted on testifying even after the trial court determined, in open court, that a duress instruction did not apply to the facts of the case:

> [TRIAL COURT:] During opening statements your attorney indicated to [ m]embers of the [j]ury that you would in fact testify in this case. Is that something you had already discussed with your attorney?

[12](...continued)
Crim. 310.10 (2019) (defining "compulsion" as "the act of compelling; the quality, state, or condition of being compelled" and "coercion" as "compulsion of a free agent by physical, moral, or economic force or threat of physical force").

-38-

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And you had decided that that's something you wanted to do?

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And that was your decision, of course, not his?

[PETITIONER:] Yes, Your Honor.

[TRIAL COURT:] And he had your consent to tell the jury that; is that right?

[PETITIONER:] Yes, Your Honor.

(Docket Entry 1-2 at 159 (emphasis added).)  Petitioner cannot fault trial counsel for her own decision to testify.  See Shell v. Secretary, Dep't of Corr., No. 5:10CV379, 2012 WL 3670261, at *5 (M.D. Fla. Aug. 27, 2012) (unpublished) (denying ineffective assistance claim because "[i]t was [the p]etitioner's own decision whether to testify, and he c[ould ]not now blame his counsel for that decision").  Petitioner has neither shown deficient performance by trial counsel with respect to his handling of the duress instruction nor regarding Petitioner's decision to testify.

Furthermore, as detailed above, in light of the overwhelming evidence of Petitioner's guilt, she could not make a sufficient showing of prejudice under Strickland.  See Mueller, 181 F.3d at 586 ("In the face of [the] defendant's videotaped confession and the powerful evidence derived therefrom, it is virtually impossible for us to imagine that he could carry the burden of establishing prejudice from his [trial] counsel's performance.").

Put simply, Ground Two entitles Petitioner to no relief.

-39-

**C.   Ground Three**

Next, Petitioner argues that "the state court decision denying post-conviction relief based upon Petitioner's claim pursuant to the [United States] Supreme Court's 2018 decision of [<u>McCoy v. Louisiana</u>] and her ineffective assistant [sic] of counsel claim was based upon an unreasonable determination of the facts." (Docket Entry 1 at 37 (standard capitalization applied, bold font and single-spacing omitted).) More specifically, Petitioner asserts that "the North Carolina state courts['] . . . 'findings of fact' were not actually determinations of fact, but conclusory statements . . . [which] failed to evaluate the evidence, weigh Petitioner's properly presented evidence against trial counsel's affidavit, examine or discuss in any meaningful fashion the trial transcript, or make any real determinations of fact." (<u>Id.</u> (citing <u>Gray v. Zook</u>, 806 F.3d 783, 791 (4th Cir. 2015) ("When a state court apparently ignores a petitioner's properly presented evidence, its fact-finding process may lead to unreasonable determinations of fact under § 2254(d)(2).").

Ground Three falters for the reasons already discussed in the context of Grounds One and Two, i.e., the MAR court does not unreasonably determine the facts under Section 2254(d)(2) merely by denying Petitioner's parallel claim summarily. <u>See</u> <u>Harrington</u>, 562 U.S. at 98 (holding that "determining whether a state court's decision resulted from an unreasonable . . . factual conclusion does <u>not</u> require that there be an opinion from the state court explaining the state court's reasoning" (emphasis added)).

-40-

Moreover, Petitioner's reliance on Gray does not aid her
cause.  In Gray, the Supreme Court of Virginia denied the
petitioner's post-conviction claim in an order containing findings
of fact that discussed trial counsel's affidavit offered by the
state but not an investigator's affidavit proffered by the
petitioner.  See Gray, 806 F.3d at 788.  Significantly, however,
the Gray court noted that, "[t]o fatally undermine the state
fact-finding  process,  and  render  the  resulting  finding
unreasonable, the overlooked or ignored evidence must be highly
probative and central to [a] petitioner's claim."  Id. at 792
(emphasis added) (internal quotation marks omitted)).  The Fourth
Circuit ultimately concluded that, "the Supreme Court of Virginia
could  reasonably  have  determined  that  the  [investigator's]
affidavit did not warrant discussion" and, "'[b]ecause fair-minded
jurists could disagree on the correctness of this conclusion, [the
petitioner wa]s not entitled to relief.'"  Id. (citing Moore v.
Hardee, 723 F.3d 488, 499 (4th Cir. 2013)).

As discussed above, Petitioner's affidavit evidence submitted
to the MAR court, even taken as true, does not establish
ineffective assistance by her trial counsel under Nixon and
Strickland. (See Docket Entry 1-10 at 27-32.)  Thus, that evidence
fails to qualify as "highly probative," Gray, 806 F.3d at 792, and
the MAR court "could reasonably have determined that [Petitioner's]
affidavit[s] did not warrant discussion," id.  Moreover,
"'[b]ecause fair-minded jurists could disagree on the correctness

of this conclusion, [P]etitioner is not entitled to relief.'" Id. (citing Moore v. Hardee, 723 F.3d 488, 499 (4th Cir. 2013)).

In sum, the Court should deny Ground Three.

## D.  **Ground Four**

Lastly, Petitioner maintains that "the state court's refusal to consider Petitioner's constitutional claim that she was denied her right to be present at a critical stage of her trial was contrary to clearly-established federal constitutional law." (Docket Entry 1 at 38 (standard capitalization applied, bold font and single-spacing omitted)).  In particular, Petitioner argues that "the United States Supreme Court rejected a per se rule prohibiting review of either legal or factual errors for plain error in the absence of an objection."  (Id. (citing Davis v. United States, ___ U.S. ___, 140 S. Ct. 1060 (2020)).)  According to Petitioner, "[i]n so holding, the [United States] Supreme Court relied upon its own precedent, previously rejecting similar rules by lower appellate courts." (Id. (citing Rosales-Mireles v. United States, 585 U.S. ___, 138 S. Ct. 1897 (2018), and United States v. Olano, 507 U.S. 725 (1993)).  Petitioner asserts that, on direct appeal, the North Carolina Court of Appeals refused to consider Petitioner's claim [that she was denied her right to be present at a critical stage of her trial] for plain error," thus rendering a "decision [] contrary to clearly-established Federal Constitutional law as announced by the [United States] Supreme Court, even prior to the Davis decision."  (Id. at 39.)

-42-

In the alternative, Petitioner contends that the plain error review by the North Carolina Court of Appeals of "Petitioner's constitutional claim that she was denied her right to be present at a critical stage of her trial . . . was based upon an unreasonable application of clearly-established federal law." (Id. at 38 (standard capitalization applied, bold font and single-spacing omitted).)  In that regard, Petitioner points out that "the United States Supreme Court has consistently held that criminal defendants have a fundamental right under the United States guarantees of Confrontation and Due Process to be present at all material stages of trial" (id. at 39 (citing Rushen v. Spain, 464 U.S. 114, 117 (1983), and Kentucky v. Stincer, 482 U.S. 730, 745 (1987))), as well as that a material stage occurs "when the defendant's presence 'might bear a substantial relationship to a defendant's opportunity better to defend himself at trial'" (id. (quoting Stincer, 482 U.S. at 745–46)).  Thus, Petitioner asserts that, by excluding her from the in-chambers discussion regarding the duress defense, "the trial court made a decision, in Petitioner's absence, about what her testimony might be, and based upon that assumption, made a decision that had the greatest impact on the only possible defense she could raise," and "th[o]se circumstances cannot be said to be harmless error."  (Id. at 40 (emphasis in original).)

As a threshold matter, Respondent maintains that Ground Four faces a procedural bar.  (See Docket Entry 5 at 17–19.)  Neither Petitioner nor trial counsel objected to the in-chambers discussion proceeding without Petitioner's presence (see Docket Entry 1-2 at

-43-

393-94) and, as a result, the North Carolina Court of Appeals reviewed Petitioner's assignment of error contesting her absence from the in-chambers discussion for plain error, Roberson, 2017 WL 2437004, at *3. "Where a petitioner fails to comply with a state procedural requirement, such as the requirement of contemporaneous objection at trial to preserve an issue for appeal, and the failure provides adequate and independent grounds for the state court's denial of relief, federal review of the issue will also be barred where the state has expressly relied on procedural default." Byers v. Hathaway, No. 3:07CV290, 2010 WL 5092247, at * 11 (W.D.N.C. Sept. 7, 2010) (unpublished) (citing, inter alia, Coleman v. Thompson, 501 U.S. 722 (1991), Harris v. Reed, 489 U.S. 255 (1989), Murray v. Carrier, 477 U.S. 478 (1986), and Wainwright v. Sykes, 433 U.S. 72 (1977)). Accordingly, the North Carolina Court of Appeals's plain error review of Petitioner's parallel claim constitutes an enforcement of procedural default. See Daniels v. Lee, 316 F.3d 477, 487-88 (4th Cir. 2003) (finding federal habeas claim procedurally barred where the petitioner failed to object at trial, resulting in plain error review of claim in North Carolina Supreme Court); Hinkle v. Randle, 271 F.3d 239, 244 (6th Cir. 2001) ("We have held that [a] contemporaneous objection rule . . . bars federal habeas review absent a showing of cause and prejudice . . . . Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default."). Furthermore, in response to Respondent's instant Motion, Petitioner did not argue that cause and prejudice or a fundamental miscarriage

-44-

of justice exist to excuse her default, see Murray, 477 U.S. at 485-97; McCarver v. Lee, 221 F.3d 583, 588-93 (4th Cir. 2000). (See Docket Entry 6.)   Thus, Ground Four remains procedurally defaulted.

Even if not procedurally barred, Ground Four fails on its merits for two reasons.   First, the Court need not determine whether the initial refusal of North Carolina Court of Appeals to consider Petitioner's parallel claim on direct appeal contravened Davis and/or prior United States Supreme Court precedent, because the North Carolina Court of Appeals alternatively reviewed Petitioner's claim for plain error.   Roberson, 2017 WL 2437004, at *3.

Second, under Section 2254(d), the adjudication of Petitioner's parallel claim on plain error review did not contravene or unreasonably apply clearly established federal law. The North Carolina Court of Appeals provided the following analysis:

> [E]ven if we were to review this issue for plain error, we would find none.   "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial."   State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012).   "To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty."   Id.   In other words, the defendant must show that, "absent the error, the jury probably would have returned a different verdict."   Id. at 519, 723 S.E.2d at 335.
>
> Here, although the meeting with the lawyers took place outside [Petitioner]'s presence, the [trial] court returned to open court and announced what took place in that conference.   Importantly, after stating that there would not be a duress instruction, the trial court asked

-45-

> [Petitioner]'s counsel to confirm that the duress
> instruction "would not be appropriate based on the facts
> of this case." [Trial c]ounsel responded (in
> [Petitioner]'s presence) by stating, "That is correct."
> Thus, <u>whatever discussion took place in the meeting
> outside [Petitioner]'s presence, [Petitioner] was present
> when her [trial] counsel decided not to request the
> duress instruction. [Petitioner] therefore failed to
> show that her absence from the conference prejudiced her
> in any way</u>.

<u>Roberson</u>, 2017 WL 2437004, at *3 (emphasis added). Even assuming, <u>arguendo</u>, that Petitioner's absence from the in-chambers discussion constituted a violation of her Due Process and/or Confrontation Clause rights under the federal constitution, the North Carolina Court of Appeals correctly observed that Petitioner failed to show how her absence from the in-chambers discussion resulted in any prejudice. <u>See</u> <u>id.</u> That failure precludes relief. <u>See</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993) (harmless error standard on federal habeas review requires trial error to have a "substantial and injurious effect or influence in determining the jury's verdict").

In short, Ground Four fails as procedurally defaulted, as well as under Section 2254(d).

## VI. Conclusion

**IT IS THEREFORE RECOMMENDED** that Respondent's Motion for Summary Judgment (Docket Entry 4) be granted, that the Petition (Docket Entry 1) be denied, and that Judgment be entered dismissing this action without issuance of a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

February 24, 2021

-46-